# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 3, 2025

## IN RE JAXON N., ET AL.

### Appeal from the Juvenile Court for Hamblen County
### No. TR230009     Blake E. Sempkowski, Judge

___

### No. E2024-01405-COA-R3-PT

___

This appeal concerns termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Hamblen County ("the Juvenile Court") seeking to terminate the parental rights of Janlynn B. ("Mother") and Eric N. ("Father") to their minor children Jaxon N. and Colton N. ("the Children," collectively). Janice B. ("Foster Mother") filed an intervening petition also seeking to terminate Mother's and Father's parental rights. After a hearing, the Juvenile Court entered an order terminating Mother's and Father's parental rights. The Juvenile Court found in part that Mother failed to attend to the Children's health needs, including Colton's serious heart condition. Mother appeals.[1] On appeal, Mother argues that the Juvenile Court did not make sufficient best interest findings and, even if it did, it erred in its analysis. We vacate the ground of substantial noncompliance with the permanency plan as the record contains only Mother's third plan. Thus, we modify the Juvenile Court's judgment to that extent. Otherwise, we find that each of the other grounds found by the Juvenile Court was proven by clear and convincing evidence. We find further that the Juvenile Court made sufficient findings on best interest. We find, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm as modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed as Modified; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Lyndon King, Kodak, Tennessee, for the appellant, Janlynn B.

___

[1] Father's parental rights were terminated in a separate order, and he has not appealed. We therefore refer to Father only as relevant to Mother's case.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the Tennessee Department of Children's Services.

## OPINION

## <u>Background</u>

Jaxon was born to Mother in July 2014; Colton in February 2021. Colton has a serious heart condition and has required multiple surgeries. However, Mother and Father stopped keeping up with Colton's medical treatment. In May 2022, DCS received a referral alleging medical neglect. Initially, DCS was unable to communicate with the family to follow up on the allegations. In July 2022, DCS received another referral, this time alleging drug exposure from an incident in which Father overdosed in a car with the Children present. Following this incident, the Children were taken in by their maternal grandmother pursuant to an immediate protection agreement. The maternal grandmother subsequently failed to get the Children to a doctor's appointment on time, which violated the immediate protection agreement. Later in July 2022, DCS filed a petition alleging that the Children were dependent and neglected. The Children were thereafter removed into state custody. In November 2022, the Children were adjudicated dependent and neglected based on Father's overdose and Mother's knowledge of the drug abuse, as well as Mother's and Father's failure to attend to Colton's medical issues. In December 2022, Mother was arrested for domestic assault against Father. Mother later pled guilty for the domestic assault. As a result of the July 2022 incident, Mother was charged with public intoxication and child endangerment. In January 2023, Mother pled guilty to public intoxication and an amended charge of attempted child neglect. Meanwhile, in August 2022, the Children were placed in Foster Mother's home. In early 2023, Colton required heart surgery, but Mother failed to timely consent. DCS intervened to ensure that Colton could undergo heart surgery.

On August 14, 2023, DCS filed a petition in the Juvenile Court seeking to terminate Mother's and Father's parental rights to the Children. DCS alleged the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody. Meanwhile, Mother's criminal issues continued. In November 2023, Mother was charged with possession of a Schedule 1 drug. In January 2024, Mother was jailed for a month for violating probation. On April 3, 2024, Foster Mother filed an intervening petition seeking termination of Mother's parental rights. Foster Mother alleged multiple grounds of abandonment, severe child abuse, mental incompetence, and substantial noncompliance with the permanency plan. Foster Mother alleged the ground of wanton disregard with respect to Jaxon only. In July 2024, Mother tested positive for fentanyl. In August 2024, this matter was heard.

First to testify was Lauren Bowers ("Bowers"), DCS case manager on the Children's case since July 2022. Mother failed to timely consent to Colton's heart surgery, so DCS had to intervene. The Children have since undergone additional procedures, but no major surgeries. The Children have also undergone therapy. Mother sometimes participated in these sessions but was inconsistent in doing so. Regarding Mother having tested positive for fentanyl, Bowers said that Mother denied using the substance. Mother told Bowers the positive result might have come from "diet pills." Asked what concerns she had about Mother's ability to care for the Children, Bowers said a lack of stability as well as pending criminal matters. Mother had a pending criminal charge of possession of a Schedule 1 drug. Mother had last seen the Children in January 2024. Before that, she usually saw the Children twice a month, and sometimes weekly. Mother would pick up Colton and then pick up Jaxon after school. According to Bowers, Mother paid a total of $220.00 in child support for the Children over the nearly two-year custodial episode. Mother also brought various gifts on visits, such as birthday and Christmas gifts.

As to the Children's lives in foster care, Bowers said they "do family things together" and have "normal family dynamics." Jaxon calls Foster Mother "Momma J" and Colton calls her some version of "momma." The Children also call Mother "momma" or "mommy." Regarding Mother's positive steps, Bowers said that Mother had obtained a driver's license, registration, and vehicle insurance. Mother also completed parenting classes. Bowers said that during the visits she supervised, Mother had shown an improvement in her parenting skills. Mother completed a mental health assessment. She also underwent an A&D assessment. Bowers said that the Children sometimes saw their half-siblings. The Children also had formed attachments with members of their foster family. Continuing her testimony, Bowers said that Mother failed to attend Colton's heart surgery. Mother did not contact Bowers at the time to say she lacked transportation or anything of that nature. Bowers acknowledged that Mother "eventually" consented to Colton's surgery. Bowers said that she had no physical safety concerns with Mother's home. Bowers' only concerns were possible crime and drug use in the home. Bowers testified that the Children did not have a particularly strong attachment to Mother due to lack of visitation.

Foster Mother testified next. Foster Mother testified that Jaxon had stayed consistent with his speech therapy, and his speech is significantly better. Meanwhile, Colton had seen a developmental and occupational therapist. Foster Mother testified to Colton's heart condition:

Q: It's a very serious condition that Colton has?
A: Yes ma'am.
Q: Correct?
A: Yes ma'am.

Q: It is a life or death type of. . .
A: Yes ma'am.
Q: . . .condition?
A: Yes ma'am.
Q: Even if you agree and consent and follow everything that the doctor is saying, correct?
A: Yes ma'am.
Q: Did you get any indication from Colton's cardiology team that mother had participated or discussed any of these procedures or situations?
A: No ma'am.  I know that on the morning of the most recent heart cath they tried to attempt to contact her for consent and were unable to do so.  So then they ended up having to contact the DCS nurse.
Q: What date was that?
A: I'm wanting to say July 19th if my memory is correct.
Q: Is this a situation in which you understand that Colton's life may be at risk?
A: Yes ma'am.  What I am constantly told is that without intervention it is life-threatening.  They do not have a crystal ball but they are hopeful with interventions that this will just follow him for the rest of his life.
Q: But even with intervention there's. . .
A: There's no crystal ball.
Q: . . .Colton has a significant risk of serious. . .
A: Yes ma'am.
Q: . . . serious. . .
A: From what I'm being told they are anticipating as he gets older potential pacemakers, etc.  He will need ongoing intervention.

Foster Mother testified further that Jaxon had undergone dental surgery.  Mother failed to attend that too.  Mother had not contacted Foster Mother about visiting the Children since January 2024.  Foster Mother's household includes two other children as well as her parents.  Foster Moster said that the Children are close-knit with their foster family.  Foster Mother testified that she loves the Children.

Mother testified last.  Regarding the Children missing medical appointments while in her care, Mother said that she had issues with her vehicle.  Mother said that she never tried to use public transportation.  Asked why she had not visited the Children since January, Mother said that she had "made some mistakes" and violated her probation.  Mother said she reached out to DCS about resuming visitation.  Mother was told she needed to complete a hair follicle drug test before visits could resume.  Mother never completed one.  Mother said that she no longer has a vehicle, but she planned to buy one in two weeks.  Mother said that her mother-in-law could take Colton to medical appointments if need be.

-4-

Mother testified that her parental attachment with the Children is "[v]ery strong." Regarding her recent positive test for fentanyl, Mother said that she knew of no reason why fentanyl would be in her system. Meanwhile, Mother's criminal charge for Schedule 1 substance remained pending. Asked what she had done to address the issue of the Children missing medical appointments in her care, one of the reasons they were removed into state custody in the first place, Mother said that she had started making reminders to herself and setting her alarm early.

Continuing her testimony, Mother said that she was not in a relationship with Father "at this time." Nevertheless, she lives in the house he owns. Mother does not pay rent. Asked about her repeated run-ins with the law, Mother said that she does not intend to get into any further trouble. Asked when she finally decided to stop committing crimes, Mother answered: "When I committed the last one I suppose." Mother could not recall when or which crime that was. As for why she had not completed a hair follicle drug test so as to visit the Children, Mother said: "I had trouble getting to [the drug test] and then I never received that. So that's . . . that's why I haven't seen them." Mother was unemployed and relied on Father, but she said that she could get a job "[i]f all else failed." Asked why she did not attend Colton's heart surgery, Mother said she had Covid at the time. Asked why she failed to attend Jaxon's dental surgery, Mother said Colton was ill that day and she went to the walk-in clinic with him. At trial's end, Foster Mother nonsuited her grounds alleged against Mother of severe child abuse, mental incompetence, and every abandonment ground except wanton disregard.

In August 2024, the Juvenile Court entered an order terminating Mother's parental rights. The Juvenile Court found the following grounds were proven by clear and convincing evidence: persistent conditions; failure to manifest an ability and willingness to assume custody; abandonment by wanton disregard; and substantial noncompliance with the permanency plan.[2] The Juvenile Court found further that termination of Mother's parental rights is in the Children's best interest. In its termination order, the Juvenile Court stated, in part:

> 5. *Persistence of Conditions.* Both the DCS and Intervening Petitions allege persistence of conditions and, as such, this conclusion applies to both. The children were removed from Mother in July, 2022 as a result of a court order in a . . . dependency and neglect petition filed by the department and placed in foster care, thus the Court concludes that the children have been so removed for a period of at least six (6) months. Based upon the above findings of fact, the children were removed as a result of medical neglect and substance abuse. The child, Colton, requires extensive medical treatment to

---

[2] On appeal, DCS concedes the ground of substantial noncompliance with the permanency plan.

manage a serious heart condition that Mother, during her testimony, exhibited little understanding of the appointments or follow up or at least was unclear on the follow up on these procedures; the child, Jaxon, had extensive dental procedures that Mother did not attend nor participate in the planning of the procedure. Although testimony reflected that Mother attended some appointments, she did not attend them all and was unavailable to provide consent for Colton's heart surgery although she did so much later. Such procedures require more immediate attention than weeks later; inconsistent participation in video appointments does not resolve the initial condition of medical neglect. Criminal conduct was also of concern at the time of the children's removal as Mother was charged with public intoxication and child endangerment. Since the children's removal Mother has continued to engage in criminal conduct as evidenced by her charge and guilty plea surrounding a domestic assault on Father and her pending charge for Schedule I drugs. Substance abuse was a condition that led to removal which continues to persist in that Mother's latest criminal charge is a drug charge and the Court also notes the positive drug screen for fentanyl on July 24. Mother has had two (2) years to remedy these conditions and has failed to do so and thus, the Court must conclude that there is little likelihood that she will remedy these conditions at an early date so that the children could be safely returned to her. The children require stability and permanency. Thus, the Court further concludes that the continuation of the parent-child relationship would greatly diminish their [chances] of early integration into a safe, stable, and permanent home that stands ready by [Foster Mother's] intent to legally adopt the children. Therefore, the Court concludes by clear and convincing evidence that the ground of persistence of conditions has been established.

6. ***Failure to Manifest.*** Both petitions allege that Mother has failed to manifest a willingness and ability to parent and/or support the children as defined in *Tenn. Code Ann.* § 36-1-113(g)(14). Mother could not testify about the basic needs of the children nor could she articulate basic information about their medical and educational needs; Mother's lack of participation in their medical care that brought them into custody has led to her continued lack of knowledge necessary to care for them which, combined with her presumed drug use or drug lifestyle indicates that the failure to manifest an ability to parent has been the result of both act and omission by Mother. Mother has failed to take any steps to attain financial security and continues to rely upon Father, whose rights have been previously terminated by this Court and for whom an arrest warrant remains active. Mother testified that she would not personally support the children but that Father would do so and thus, the Court concludes that Mother has failed to manifest a willingness nor ability to personally assume the financial support of the

children. Additionally, the Court concludes based upon the testimony that placement of the children in Mother's care would pose a substantial risk of harm to both children's physical and mental health; that Mother has continued to engage in a drug lifestyle incurring additional criminal charges that have recently led to her incarceration for 30 days. Mother testified to a relationship with Father, although she denied it was romantic, that would likely result in the children's exposure to Father's criminal and drug lifestyle. Most significantly, Mother has demonstrated little interest in the health of Colton who has a life threatening illness, nor the health and education of Jaxon. Therefore, the Court concludes that the ground of Failure to Manifest has been established by clear and convincing evidence.

7. ***Wanton Disregard.*** The intervening petition alleged the ground of abandonment by wanton disregard. Mother was incarcerated for 30 days beginning in late January, 2024 which was in the four months before the filing of the intervening petition on April 3, 2024 and thus, the Court may consider Mother's actions throughout the children's lifetimes to determine if she has shown a wanton disregard for their welfare. Most recently, Mother has tested positive for fentanyl which occurred after her incarceration which was the result of a violation of probation due to a separate charge for possession of Schedule I drugs in December, 2023. These actions demonstrated no regard for the children's welfare. The evidence is clear that Mother has been inconsistent in her attendance and participation in the children's medical and educational care and finally, Mother has not seen the children for a period of seven (7) months that she testified was the result of her belief that she had to complete a hair follicle drug screen which she did not complete. Without further analysis, the ground of wanton disregard has been established by clear and convincing evidence.

\*\*\*

9. ***Best Interest.*** The Court has considered the statutory best interest factors, which apply to both petitions. The Court does not find that any of the statutory factors or other relevant evidence weigh *against* termination and that the following factors weigh in favor of termination:

***a. Stability and Continuity.*** Termination of Mother's parental rights would free the children for adoption with [Foster Mother] standing ready, willing, and able to legally adopt the children and provide them with a safe, stable home that would meet all of their needs.

***b. Change in Caretakers.*** Mother lacks stability and the children have found stability. The continued criminal activity and drug lifestyle has not been resolved. The children have established a familial bond with the foster

family and thus, a change in caretakers would be emotionally devastating to the children and would place them at risk of further abuse or neglect if placed in the care of Mother.

      *c. Parental Stability.*   Mother has not achieved stability, faces additional criminal penalties and continues to be involved with illegal drugs. Mother has no means to support herself nor the children and has little interest in participation in the children's care.

      *d. Visitation.*   Mother has not visited with the children in seven (7) months.

      *e. Parental Bond.*   The children have developed a parental bond with [Foster Mother] in the absence of Mother.

      *f. Change in Circumstances.*   Mother remains in the same position as she did when the children were removed – facing criminal charges, engaged in illegal drug use, living in a home where there is criminal activity.

      *g. Reasonable Efforts.*   DCS has made reasonable efforts and even attempted to continue to work with Mother after her incarceration.

      *h. Sense of Urgency.*   Mother continues to present no urgency in regaining custody of her children.

      *i. Understanding of Basic Needs.*   Mother does not understand the children's needs and has made little to no effort in gaining such an understanding while continuing to engage in criminal conduct and drug use.

      *J. Commitment and Ability to Create/Maintain a Home.*   Mother has made no changes in this regard for remained drug free nor exhibited any commitment to the understanding of the children's care.

      *k. Support.*   The $220 in support that Mother has provided is token in nature.

10. Based upon the foregoing, the Court concludes by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the herein children and both petitions shall be granted.

Mother timely appealed to this Court.

### Discussion

Although not stated exactly as such, Mother raises the following issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own

determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge any of the grounds found against her, we must review them all anyway. *In re Carrington H.*, 483 S.W.3d at 511 ("[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.").

When DCS and Foster Mother filed their termination petitions, the relevant grounds for termination of parental rights were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard; [and]

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2023 to June 30, 2024).

Abandonment by wanton disregard, a ground alleged by Foster Mother in her intervening petition, was defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more or three (3) consecutive months immediately preceding the filing of the action if the child is less than four (4) years of age and has:

\*\*\*

(c) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

-13-

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (West July 1, 2023 to June 30, 2024).

We begin by addressing the ground of substantial noncompliance with the permanency plan. DCS concedes this ground, noting that Mother's third permanency plan was the only permanency plan admitted into the record. DCS's concession is appropriate. We therefore vacate the ground of substantial noncompliance with the permanency plan.

We next address the ground of persistent conditions. The Children were removed after DCS filed its dependency and neglect petition, and the period of removal lasted well over the requisite six months before the first setting of the termination hearing. The original conditions leading to removal were medical neglect and concerns over exposure to drugs. Regrettably, the conditions leading to the Children's removal still persist. Mother tested positive for fentanyl only one month before trial. Mother disputed the result, but the Juvenile Court clearly did not credit her testimony as it noted her positive test result in its findings on persistent conditions. "We will not overturn a trial court's credibility determination—be it implicit or explicit—absent clear and convincing evidence to the contrary." *Kautz v. Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at *7 (Tenn. Ct. App. Mar. 18, 2021), *no appl. perm. appeal filed*. There is no clear and convincing evidence in this record to overturn the Juvenile Court's implicit credibility determination against Mother. In addition, Mother has engaged in repeated criminal behavior. She has a pending charge related to possession of a Schedule 1 drug. At trial, Mother showed a distinct lack of seriousness about her behavior. Asked when she decided to stop committing crimes, Mother testified "[w]hen I committed the last one I suppose." Mother could not recall which of her multiple crimes was the last one or when it was.

Regarding medical neglect, as late as July 2024, Mother could not be reached to obtain consent for Colton's most recent medical procedure. For Colton, failure to promptly act on his heart condition means life or death. Mother clearly does not understand this. Asked how she would rectify her demonstrated inability to timely attend to the Children's healthcare needs, Mother said that she would make reminders to herself and set her alarm for early. In view of her repeated failure to act promptly on the Children's medical needs, Mother's testimony rings hollow. The original conditions leading to removal that would cause the Children to be subjected to further abuse or neglect still persist and prevent the Children's safe return to Mother.

Mother's conduct did not materially change over the course of two years, with continued criminal activity and further neglect of the Children's needs. Given this extended period of time with no real progress, we find that there is little likelihood these conditions will be remedied at an early date so that the Children can be safely returned to Mother in the near future. By contrast, the Children have lived in Foster Mother's home

since August 2022, and their needs are being properly addressed. In view of Mother's ongoing issues, the continuation of the parent and child relationship between Mother and the Children greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home, which they have with Foster Mother. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of persistent conditions was proven by clear and convincing evidence.

The Juvenile Court also found the grounds of abandonment by wanton disregard and failure to manifest an ability and willingness to assume custody. Foster Mother alleged the ground of wanton disregard with respect to Jaxon only. Wanton disregard is applicable because Mother was incarcerated for around a month beginning in late January 2024, thus within four months of the filing of Foster Mother's intervening petition on April 3, 2024. Mother's repeated criminal conduct and failure to consistently attend to Jaxon's needs support the Juvenile Court's finding that Mother displayed a wanton disregard for Jaxon's welfare. Regarding failure to manifest an ability and willingness to assume custody, a ground alleged with respect to both Children, Mother has manifested neither ability nor willingness. She has engaged in repeated criminal conduct and continued to neglect the Children's medical needs. In view of Mother's behavior, and especially her lack of interest in the Children's health, placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. We find, as did the Juvenile Court, that the grounds of abandonment by wanton disregard as to Jaxon and failure to manifest an ability and willingness to assume custody regarding both Children were proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. When the termination petitions were filed, the statutory best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

-15-

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2023 to June 30, 2024).

Mother argues first that the Juvenile Court's findings on best interest were insufficient. Mother observes that the Juvenile Court's written order only detailed the Juvenile Court's findings in favor of terminating her parental rights, whereas in its oral ruling, the Juvenile Court found that several factors did not favor termination. According to Mother, this discrepancy precludes our appellate review. Mother asks that we remand for further findings.

The best interest section in the Juvenile Court's termination order is not ideal in that it does not contain express findings for each statutory factor. We have stated that "the better and safer practice for trial courts, in order to avoid undue delay and remand, is to make findings for each best interest factor, whether it weighs in favor of termination, against termination, or is neutral." *In re Danielle V.*, No. W2023-01023-COA-R3-PT, 2024 WL 342518, at \*11 n.9 (Tenn. Ct. App. Jan. 30, 2024), *no appl. perm. appeal filed*. Nevertheless, even though it is the better and safer practice, "we have not required that trial courts necessarily spell out each best interest factor by letter so long as it is clear they have considered all of the factors and made sufficient findings as to the relevant factors." *Id.* at \*11. We have stated: "[W]hile doing so helps facilitate appellate review, a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the order contains

sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision." *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *8 (Tenn. Ct. App. Dec. 4, 2023), *no appl. perm. appeal filed*. We have stated further that "[s]o long as the trial court's written order contains findings of requisite specificity that show that termination is in the child's best interest, the fact that the findings are not set out in the 'best interest' section of the order does not render the order insufficient." *In re Adoption of C.A.M.*, No. W2008-02003-COA-R3-PT, 2009 WL 3739447, at *7 (Tenn. Ct. App. Nov. 9, 2009), *no appl. perm. appeal filed.*

In the present case, the termination order as a whole contains a number of findings pertinent to the Children's best interest encompassing many if not all of the statutory best interest factors, to wit: Mother's lack of understanding of Colton's heart condition; her criminal conduct; her substance abuse; her financial dependence on Father; the prospect of Father remaining in the Children's lives; Mother's lack of interest in the Children's health issues; and her failure to see the Children for seven months before trial. We also note that the Juvenile Court found that none "of the statutory factors or other relevant evidence weigh *against* termination . . . ." It is apparent that the Juvenile Court considered the statutory factors and made appropriate findings throughout its order, not only in the best interest section. We find that the Juvenile Court's termination order as a whole contains sufficient findings to enable our appellate review as to the Children's best interest.

Mother argues next that, even if the Juvenile Court's findings on best interest are sufficient, the Juvenile Court erred in its analysis. Mother makes several contentions in support of her argument, including: that Mother has resolved her legal issues save for one in which she is presumed innocent; that she has had only one failed drug screen over the custodial episode and she disputes it; that Mother's failure to visit the Children in the seven months before trial was not willful; that Mother no longer lives with Father; that Mother has lived in the same home for the whole custodial period; that Mother is working toward a transportation plan; that Mother took advantage of the services offered to her; and that there is no evidence to support that Mother's payment of a total of $220.00 over the custodial episode was token.

Several of Mother's assertions rely on her own testimony. The Juvenile Court was not obliged to credit Mother's testimony, and it is clear from its order that it did not. This is understandable. Mother's testimony was problematic at best. Even still, there were some positive things done by Mother. For instance, Mother completed parenting classes and assessments. She showed improvement in her parenting skills on some of her visits before she stopped visiting all together.

Nonetheless, the evidence in favor of termination vastly outweighs Mother's positive steps. At trial, asked about her repeated legal troubles and when she decided to

stop committing crimes, Mother said "[w]hen I committed the last one I suppose." Mother could not remember which of her multiple crimes was the last one or when it occurred. Indeed, Mother has engaged in repeated criminal activity. She tested positive for fentanyl a month before trial. While Mother "disputes" the positive result, she has only her word to go on, which the Juvenile Court plainly did not credit. With respect to child support, the Juvenile Court did not err by considering the paltry amount of Mother's child support over the custodial period as part of its best interest analysis. Were this the ground of abandonment by failure to support, Mother might have a point. However, this is the best interest analysis, and all evidence relevant to the Children's best interest may be considered. Mother depends on Father for money. At trial, Mother said that she could get a job "[i]f all else failed." Mother once again displayed no seriousness or urgency in doing what was necessary to resume custody of the Children. With respect to visitation, Mother failed to visit the Children for seven months leading up to trial. This was because Mother failed to complete a hair follicle drug test to allow visitation to resume. Once more, Mother showed a lack of urgency, and the Juvenile Court did not credit her excuses.

Perhaps the weightiest consideration in this matter relates to Mother's demonstrated lack of interest in the Children's health. Colton has a serious heart condition. He cannot afford to miss his medical appointments, nor can he suffer undue delays in obtaining consent for whatever procedures he may need going forward. Medical neglect was one of the conditions leading to the Children's removal. Mother offered a raft of excuses for her failure to see to the Children's needs, excuses which the Juvenile Court plainly did not credit. At trial, Mother said that she would make reminders to herself and set her alarm for earlier. The Juvenile Court did not find this to be a satisfactory guarantee that Mother will do what needs to be done for the Children's health moving forward, and neither do we. As recently as July 2024, Mother could not be reached to obtain consent for Colton's heart catheter procedure. Mother's unwillingness or inability to attend to the Children's health needs, particularly Colton with his serious heart condition, poses a major risk to the Children's well-being and weighs heavily in favor of terminating Mother's parental rights. Meanwhile, the Children have their needs addressed in Foster Mother's home. The Children have also bonded with their foster family. The prospect of removing the Children from their stable environment to return to the grave risks posed by Mother is contrary to the Children's best interest. The evidence does not preponderate against the Juvenile Court's findings relative to the Children's best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

We vacate the ground of substantial noncompliance with the permanency plan. Otherwise, we affirm the judgment of the Juvenile Court as modified, resulting in affirmance of the termination of Mother's parental rights. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Janlynn B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE